FILED
02 SEP 19 PM 2:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
SEP 19 2002

```
             UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ALABAMA
                   SOUTHERN DIVISION

CHERYL BURRELL,              }
                             }
         Plaintiff,          }
                             }
v.                           }    CV 00-AR-3684-S
                             }
CSC HEALTHCARE, INC.         }
                             }
         Defendant.          }
```

## MEMORANDUM OPINION

Before the court is the motion of defendant, CSC Healthcare, Inc. ("CSCH") for summary judgment. Plaintiff, Cheryl Burrell ("Burrell") a black female, instituted this action against her employer, CSCH, on December 22, 2000, making claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, including the "Civil Rights Act of 1991," 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981a. Burrell claims that she was not selected for a promotion to Imaging Room Supervisor because of her race, and that a less qualified white female, Chris McGehee ("McGehee"), was selected constituting race discrimination. Burrell initially made a claim against CSCH for discriminatory imposition of discipline, but this claim has been abandoned at the summary judgment stage, and accordingly the court will not address it.

## Material Facts

CSCH is in the health care industry. One of its lines of business is the processing of medical claims for the insurance industry. On July 6, 1998, Burrell began working as an Imaging

Room/Data Capture Clerk for defendant, known as Nichols TXEN at the time and now known as CSCH. Burrell works in CSCH's Mail Room processing medical and/or dental forms. Employees in the Mail Room sort and batch medical forms and send them to CSCH's Imaging Department for scanning.

In September of 1999, Joanna Trivett ("Trivett") was hired by CSCH as Manager of its Mail Room, Imaging, and Data Entry Departments. Shortly after CSCH hired Ms. Trivett, she became responsible for filling several vacancies for supervisory and lower level positions in the Data Entry and Imaging departments. Altogether, over a period of time, there were three vacancies posted internally for Data Entry Supervisor ("Vertex Supervisor"), and one vacancy for Imaging Supervisor.

CSCH posts vacancies for positions internally via an electronic posting system. Employees may submit applications either electronically or by submitting a paper application through the manual process. To apply electronically employees fill out their relevant data on a computer form, including the position for which they are applying, their qualifications for the position, and then electronically sign and date the application.[1]

---

[1] The computer form contains a section that reads, in part, "Entering my name in the field below will act as my electronic signature and indicates my understanding and acceptance of the above statements." (See Burrell's Evidentiary, Ex 10).

2

After posting openings for the position of Vertex Supervisor, Trivett began conducting interviews of potential candidates.[2] On October 18, 1999, Connie Robinson ("Robinson"), the Imaging Supervisor at that time, submitted an application. Robinson was subsequently selected for a lateral transfer to fill one of the Vertex Supervisor positions.[3] Margo Gaines ("Gaines"), a black female, interviewed on November 3, 1999, for another one of the Vertex Supervisor positions. Trivett testified that while Gaines applied for and was interested in the Vertex Supervisor's position, Trivett felt she would be better in the Imaging Department. According to Trivett, even though the Imaging Supervisor's position was not yet officially open because Robinson had not moved over to Data Entry Department, Gaines was offered the position.[4] Gaines, however, declined the position

---

[2] The record does not contain the exact sequence of events, but nevertheless, at one point there were three openings for the position of Vertex Supervisor that came open within a few weeks of each other, and one opening for Imaging Supervisor.

[3] The Personnel Action Form for transferring Connie Robinson to the position of Vertex Supervisor was signed by S. Kilpatrick on November 29, 1999. The form also contains the signatures of Joanna Trivett with an indication that she signed on November 13, 1999, and Ernie Pero with an indication that he signed on November 18, 1999. In any case, Robinson's former position of Imaging Supervisor was posted as open as early as November 12, 1999.

[4] Gaines filled out a Nichols Employment Application, paper application, on November 4, 1999.

with CSCH because she accepted an offer from another company.[5] One of the Vertex Supervisor positions was filled by Curtis Jemison ("Jemison"), a black male.[6] On November 8, 1999, Trivett interviewed Jermeria Johnson ("Johnson") for one of the Vertex Supervisor slots, but Trivett did not recommend making her an offer. The record indicates that Trivett did not extend an offer to Johnson because she did not possess the maturity level required of a position of this nature. Trivett further noted on the interview form that Johnson was in a Team Leader role at that time and would be a candidate for the future.

On November 12, 1999, Trivett gave notice of the Imaging Supervisor vacancy created by Robinson's transfer to Vertex Supervisor. (Def. EX 8). At this point, Trivett had two supervisory positions, one for Vertex Supervisor and one for Imaging Supervisor. In addition to the two supervisory positions, Trivett also had four lower level openings for Vertexers, a non-supervisory position requiring a high school diploma and experience keying medical claims into CSCH's computer system. Trivett testified in her deposition that because she had

---

[5] The record contains a copy of the Job Offer Approval Form for Gaines dated November 4, 1999, and on that form, the Job Title for the position listed is Vertex Supervisor.

[6] While the record reflects that Jemison was interviewed on November 8, 1999, the record does not contain the exact date that the position was offered to him, or the date on which he started in this position.

several positions to fill she would consider applicants that interviewed for any of the positions open, regardless of what position the applicant applied for, if she felt the applicant's qualifications were better suited to another vacancy.

Gloria Hatcher ("Hatcher"), a black female, submitted her resume for review and consideration to CSCH for the position of Vertexer II (Team Leader), one of the lower level positions that Trivett had open on October 26, 1999. Trivett, however, selected Hatcher for the remaining Vertex Supervisor's position, and a Job Offer Approval Form requesting approval for the hiring of Hatcher was sent from Robyn Black ("Black") to Jeremy Sprinkle ("Sprinkle") on December 8, 1999.

### The Imaging Supervisor Position

Chris McGehee ("McGehee"), a white female, applied for the position of Vertex Supervisor by submitting a Nichols Employment Application, a paper application, on November 16, 1999. On November 17, 1999, Trivett interviewed McGehee for the position of Imaging Supervisor instead of Vertex Supervisor. The Applicant Interview Form indicates that Trivett found McGehee qualified for the position and recommended offering her the position on that date. A Job Offer Approval Form, requesting approval for the hiring of McGehee was forwarded from Black to Sprinkle on November 22, 1999. A review of the form indicates that Trivett as Manager, and Ernie Pero as Director/Manager, had

5

previously approved the hiring of McGehee, and the form lacked only the approval of the Vice President/General Manager. CSCH concedes that it made the actual offer of employment to McGehee on December 3, 1999.[7]

In addition to McGehee, CSCH contends that Trivett considered all the candidates for the position of Imaging Supervisor that applied before McGehee was selected. Trivett testified that she could not "recall the names" of the internal candidates she interviewed but that she "did interview everyone that had applied internally that [she] was aware of." (Trivett Depo. p. 21).

Burrell contends that Trivett also failed to hire other qualified blacks for the position of Imaging Supervisor. According to Burrell, Patricia Ann Morris ("Morris"), a black female, also applied for the position of Imaging Supervisor and was not selected by Trivett for the position, nor was she interviewed.[8] And as Burrell contends, the record does indicate

---

[7]CSCH concedes this point based on Trivett's testimony regarding a printout of CSCH's computer Requisition Form that shows the status for McGehee as "accepted" on that date. However, Trivett's testimony regarding the actual date that McGehee was offered the position is not clear. (Trivett Depo. at 121).

[8]According to CSCH's Career Opportunity Application for Morris, she did apply for Imaging Supervisor, but the court notes that she indicated on her application that she had been in the position of Imaging Clerk for six months as a temporary employee and nine months full time. (Plaintiff's Ex. 12). According to the CSCH form an employee is only eligible to apply for a posted

that she was not interviewed. On the copy of Morris' computer application form someone penciled in "filled." Unfortunately, Morris' application was not electronically signed and neither was it dated, so it is impossible to tell if Morris applied when the position was open or after it was filled.

### Burrell's Application Date

The actual date of Burrell's application is a contentious issue between the parties. Burrell contends, as verified by her deposition testimony, that she submitted an electronic application to Jennifer Swistak of Human Resources and to Sherry Hodges ("Hodges"), her immediate supervisor, on November 29, 1999, when she temporarily returned to work while on medical leave.[9] (Burrell Depo., pp. 147-151). However, the date of Burrell's electronic application, and her sworn EEOC complaint indicate that she applied on December 7, 1999.

### Burrell's Qualifications

It is undisputed that Burrell's employment history with CSCH up until the time she was passed over for the position of Imaging

---

position if they have been in their current position for a minimum of one year, in good standing with the Company, and meet the minimum qualifications required for the position.

[9]On November 3, 1999, Burrell requested a medical leave of absence for surgery from November 23, 1999 until January of 2000, however, Burrell contends that she returned to work on November 29, 1999 to assist another employee, Debra Smith with production reports. Burrell returned to work full time on December 21, 1999.

7

Supervisor was excellent. (Plain. Evid. EX 2). Burrell received excellent ratings in all categories on her performance evaluation of July 1999, as well as numerous "Outstanding Performance Awards" in late 1998 and 1999 (Plain. Evid. EX 2 & 3). Additionally, Burrell was held in high regards by her supervisor, Hodges who encouraged and helped her apply for the position of Imaging Supervisor. (Pltff's. Evid. EX 26, p. 47, 32, 33-34). Unfortunately, the employer/employee relationship between CSCH and Burrell began to deteriorate after McGehee was selected for the Imaging Supervisor position.

In April of 2000, CSCH placed a "Notice to Correct Deficiences," a letter of reprimand for failure to report time taken away from her position, in Burrell's file. During the Equal Employment Opportunity Commission's initial investigation of Burrell's claims, CSCH mistakenly stated in its Position Statement of May 25, 2000, that one of the reasons Burrell was not selected for the position of Imaging Supervisor was that she did not qualify because of the letter of reprimand in her file. However, the incident that Burrell was reprimanded for, and the subject of the letter, did not occur until April of 2000. (Pltff's Evid. Ex. 16). CSCH subsequently amended its Position Statement to correct the mistake on June 2, 2000.[10]

---

[10] From the record, it appears that CSCH corrected its May 25, 2000, Position Statement of its own accord.

### Racial Slurs

Burrell alleges that Trivett's racial bias influenced her to select McGehee and offers evidence of Trivett's use of racial slurs to support this contention. Hodges, a white female, and Burrell's supervisor, testified that she heard Trivett use the word 'nigger' when referring to someone, not an employee. Hodges testified as follows:

> Q. Did you ever hear her [Trivett] use derogatory racial language?
>
> A. Yes.
>
> Q. What did you hear her [Trivett] say?
>
> A. She used the "N" word on occasion talking about someone outside the company.
>
> Q. Who was she talking about?
>
> A. I never met the person.
>
> Q. When you say using the "N" word, you mean she used the word nigger describing somebody outside the company?
>
> A. Yes.
>
> Q. How many times have you heard her [Trivett] use that?
>
> A. A couple.
>
> Q. About the same person?
>
> A. Yes.

However in her testimony, Trivett indicated that she had no recollection of ever using the word "nigger" at CSCH, but that she had heard black employees use the word when referring to each other and had corrected them. (Trivett Depo. p. 118-120).

CSCH's supports its position that Trivett was not motivated by racial animus with the fact that Trivett selected blacks to fill several of the supervisory openings. Three blacks, Jemison, Hatcher, and Gaines, were selected by Trivett for four supervisory positions that were open.[11] However, Burrell argues in its brief in opposition to CSCH's Motion For Summary Judgment that the only reason that Trivett selected Jemison, Hatcher, and Gaines was that there were no whites in the pool of candidates. CSCH disputes the allegation that Trivett only had black applicants to choose from and submitted affidavit evidence to supplement the record. The court granted CSCH's Motion To Supplement the Evidentiary Record. An affidavit of Selenia Kilpatrick, Human Resources Manager for CSCH, states that Trivett selected Jemison, Hatcher, and Gaines over white applicants Martha Webster, Joan McCombs, Kristi Harris and Hodges, Burrell's supervisor.

As additional evidence of Trivett's racial animus, Burrell urges the court to consider the EEOC Charge of Krischaun Bryant ("Bryant"). Bryant's EEOC charge alleges that Trivett

---

[11]Gaines declined to accept the offer.

10

discriminated against Bryant because Trivett disciplined Bryant by discharging her, and because Trivett referred to her and other black females in the department as "girls." CSCH argues, however, that Bryant's EEOC charge is not relevant to this case because the EEOC dismissed Bryant's Charge on March 15, 2000, without a conclusive finding that the statutes had been violated.

## Analysis

The court, when considering CSCH's motion for summary judgment, views Burrell's evidence in the light most favorable to her. Accordingly, the court accepts Burrell's position that she applied on November 29, 1999, when determining whether CSCH's motion for summary judgment should be granted. Burrell has presented no direct evidence of discrimination, but rather only circumstantial evidence of discrimination. Accordingly, Burrell's claim is analyzed under the *McDonald Douglas/Burdine* evidentiary framework. Once an employee presents a *prima facie* case of circumstantial discrimination, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the employee's rejection.

The parties have spent considerable time arguing over the issue of whether Burrell has established a *prima facie* case of racial discrimination. Specifically, whether Burrell was actually rejected for the position of Imaging Supervisor. Assuming *arguendo* that Burrell has made out her *prima facie* case,

CSCH must come forward with its legitimate reason or reasons for the challenged employment action. CSCH argues that Burrell was never considered for the position because management had already made its selection on November 22, 1999, when the Job Approval Form was being circulated, long before Burrell applied on November 29, 1999. CSCH does not have the burden of proving its nondiscriminatory reason, but it "must raise 'a genuine issue of fact' by means of admissible evidence 'legally sufficient to justify a judgment for defendant." See *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir. 1984). CSCH has met its burden.

### Pretext

Burrell challenges CSCH's defense of its employment action as pretextual with the following: 1) that Trivett, the decision-maker, failed to interview black candidates who applied for the position of Imaging Supervisor and hired a white applicant; 2) that CSCH shifted its position regarding its reasons for not selecting Burrell for Imaging Supervisor during the EEOC's investigation of Burrell's charge; 3) that Bryant, another CSCH employee filed a complaint with the EEOC against Trivett in 2000; and 4) that Trivett used racial slurs when referring to blacks who were not employees of CSCH in a non-work related context, and she now denies it.

Burrell's first argument is that Trivett, the decision-

maker, did not interview other blacks who applied for the Imaging Supervisor position. Burrell's first argument is misplaced. The record reflects that the only other applicant to specifically apply for the Imaging Supervisor position was Morris. Unfortunately, Morris did not sign and date her application. Morris' application indicates that the position was filled when she applied, and Burrell offers no evidence to the contrary. CSCH's failure to interview a person for a position once it is filled does not suggest racial animus. The record contains evidence that applicants for other positions were considered for the Imaging Supervisor position, including other blacks.

Secondly, Burrell argues that inconsistencies in CSCH's articulated reasons for not hiring her constitutes pretext. The court does not agree. Burrell points to the fact that CSCH's EEOC Position Statement contained an error regarding one of its articulated reasons for not hiring Burrell. CSCH initially reported to the EEOC that one of the reasons Burrell was not selected for the position of Imaging Supervisor was because she had a letter of reprimand in her file. In fact, the letter of reprimand was not in Burrell's file at the time she applied for Imaging Supervisor. Nevertheless, CSCH asserts that it corrected its mistake within seven days, on June 2, 2000. Burrell contends, without any supporting evidence, that CSCH only corrected its mistake after the EEOC's notification of the error.

13

Burrell cannot rely on mere speculation but rather must present evidence to overcome a motion for summary judgment.

Burrell is actually the party who changed her position. CSCH's stated reason for not hiring Burrell was that she did not apply until December 7, 1999, after McGehee had accepted the position. After CSCH submitted its Position Statement to the EEOC stating that McGehee had accepted the position on December 3, 1999, Burrell changed her story with the EEOC about when she filled out her application. When Burrell filed the instant case, she submitted affidavit evidence and deposition testimony that she in fact applied for the position on November 29, 1999, even though her sworn EEOC Charge, and her CSCH application contain the date December 7, 1999.

Burrell urges the court to consider an EEOC Charge filed by another CSCH employee, Krischaun Bryant, in February of 2000, as additional evidence of Trivett's discriminatory bias. In her complaint to the EEOC Bryant alleges that Trivett called black female employees "girls," and that she was discharged after being reprimanded by Trivett because of her race. Bryant filed her charge with the EEOC on February 16, 2000, and the EEOC issued a right-to-sue letter on March 15, 2000, with no conclusive finding of statutory violation. Bryant's charge of discrimination is only tangentially related to the employment decision at issue in the instant case. The only possible significance of this

14

evidence is that Bryant held the subjective belief that Trivett was racially biased because she used the term "girls" when referring to female employees, and she was able to challenge an unfavorable employment decision on this basis. The court finds that Bryant's charge, coupled with the instant case, fall short of constituting substantial evidence of a pattern of discrimination or of pretext.

Finally, Burrell, relying on the Eleventh Circuit decision in *Ross v. Rhodes Furniture*, 146 F.3d 1286 (11th Cir. 1998), also argues that Trivett's use of racial slurs in a non-work related context is circumstantial evidence of discriminatory animus. Burrell is correct that the use of racial slurs by decision-makers in contexts that are unrelated to the questioned employment decision can be circumstantial evidence of discriminatory animus. *See id*. However, the Eleventh Circuit has recently made it clear that the "evidence relating to the discriminatory comments [must be] 'read in conjunction with the entire record' and 'considered together with' the other evidence in the case." *See Scott v. Suncoast Bev. Sales*, 295 F.3d 1223, 1230 (11th cir. 2002)(quoting *Ross*, 146 F.3d at 1291-92). The court in *Suncoast* distinguished *Ross* on the basis that in that case there was fairly strong supporting evidence of a finding of pretext in addition to the evidence of racial slurs. *Id*. In *Suncoast*, as in the instant case, there is simply no additional

evidence "even marginally persuasive on the issue of pretext." *Id.* at 1230. The court finds, as did the court in *Suncoast*, that while "comments unrelated to a termination decision may contribute to a circumstantial case for pretext, it will usually not be sufficient absent some additional evidence supporting a finding of pretext." *See id.* at 1229. (internal citation omitted).

   CSCH's articulated reason for not hiring Burrell is that it had already made the decision to offer the position to Chris McGehee on November 22, 1999, when the Job Offer Approval Form was being circulated for approval. It is CSCH's position that it had no way of knowing that Burrell was interested in the position on November 22, 1999, and no obligation to continue to consider candidates after management had made its selection. Even if Burrell applied on November 29, 1999, as she now contends, this was a full week after management made its decision to hire McGehee. Burrell offers no evidence to rebut CSCH's position. Burrell argues that CSCH can provide evidence of the actual date of Burrell's E-mail application and has not done so. The burden, however, is not on CSCH to prove the truth of its articulated reason for hiring McGehee. The burden of persuasion is on Burrell to present evidence that rebuts CSCH's proffered reason; this Burrell has not done.

   Burrell has failed to present sufficient evidence in the

aggregate to prove pretextual CSCH's reason for not hiring Burrell as the Imaging Supervisor, namely that at the time that Burrell applied for the position on November 29, 1999, CSCH had already made its decision to hire McGehee.

## Conclusion

For the foregoing reasons summary judgment for CSCH will be granted. A separate and appropriate order will be entered.

DONE this ___19th___ day of September 2002.

/s/ William M. Acker

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE